IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHRISTOPHER TUCKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. CIV-11-922-D |
| v. | ) | |
| | ) | |
| (1) CITY OF OKLAHOMA CITY; | ) | |
| (2) LANCE BEMO; | ) | |
| (3) JURDEN BROWN; | ) | |
| (4) MATHEW NELSON; | ) | |
| (5) JEFF COOPER; | ) | |
| (6) JOHN BLUMENTHAL, | ) | |
| | ) | |
| Defendants. | ) | |

## PARTIAL MOTION FOR SUMMARY JUDGMENT
## OF THE DEFENDANT OFFICERS
## AND BRIEF IN SUPPORT

Susan Ann Knight, OBA #14594
Stacey Haws Felkner, OBA #14737
Manchester & Knight, PLLC
One Leadership Square, Suite 800 N
211 North Robinson
Oklahoma City, Oklahoma, 73102
Telephone: (405)235-4671
Facsimile:  (405)235-5247
Attorneys for Defendants, Oklahoma City
Police Officers Lance Bemo, Jurden Brown,
Mathew Nelson, Jeff Cooper and John
Blumenthal

Dated: January 11, 2013

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PARTIAL MOTION FOR SUMMARY JUDGMENT
OF THE DEFENDANT OFFICERS AND BRIEF IN SUPPORT  . . . . . . . . . . . . . . . 1

BRIEF IN SUPPORT OF PARTIAL
MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

UNCONTROVERTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PROPOSITION I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      THE DEFENDANT OFFICERS ARE ENTITLED
      TO SUMMARY JUDGMENT ON THE STATE LAW
      CLAIM FOR THE TORT OF OUTRAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

PROPOSITION II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      DEFENDANT OFFICER BEMO IS ENTITLED
      TO SUMMARY JUDGMENT ON THE STATE LAW
      CLAIM FOR TORTIOUS INTERFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . 15

PROPOSITION III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      DEFENDANT OFFICER BLUMENTHAL IS
      ENTITLED TO SUMMARY JUDGMENT ON THE
      CLAIM FOR CIVIL RIGHTS VIOLATIONS UNDER §1983 . . . . . . . . . . . . . 17

PROPOSITION IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      THE DEFENDANT OFFICERS ARE ENTITLED
      TO SUMMARY JUDGMENT ON THE §1983 CLAIM FOR
      FAILURE TO PROVIDE PROPER MEDICAL ATTENTION . . . . . . . . . . . . 19

PROPOSITION V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    THE DEFENDANT OFFICERS ARE ENTITLED
    TO SUMMARY JUDGMENT ON THE §1983 CLAIM
    FOR ILLEGAL SEIZURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

*Bennett v. Passic*, 545 F.2d 1260 (10th Cir.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Blossom v. Yarbrough*, 429 F. 3d 963, 966 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . 18, 19

*Breeden v. League Services Corporation*,
1978 OK 27, 575 P. 2d 1374, 1376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Brown v. State Farm Fire and Cas. Co.*,
2002 OK CIV APP 107, 58 P.3d 217, 223 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F. 3d 1073, 1093 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Cohlmia v. Cardiovascular Surgical Specialists Corp.*,
693 F. 3d 1269, 1285 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Colton v. Smotherman*, 2006 WL 222499 (W.D.Okla.) . . . . . . . . . . . . . . . . . . . . . 17, 19

*Gallegos v. City of Colorado Springs*,
114 F. 3d 1024 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Gaylord  Entertainment Company v. Thompson*,
1998 OK 30, 958 P. 2d 128, 149 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hubbert v. Moore*, 923 F. 2d 769, 773 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673,
145 L.Ed.2d 570 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jamarillo v. Colorado Judicial Department*,
427 F. 3d 1303, 1313 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

*Jenkins v. Woods*, 81 F.3d 988, 994 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Kimberly v. DeWitt*, 1980 OK CIV  APP 2, 606 P. 2d 612 . . . . . . . . . . . . . . . . . . . . 13, 14

*Miner v. Mid-America Door Company*,
2003 OK CIV APP 32, 68 P.3d 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Oliver v. Woods*, 209 F.3d 1179,
1191 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Oxedine v. Negron*, 241 F. 2d 1271, 1276 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 20

*Reid v. Wren*, 57 F.3d 1081,
1995 U.S. App. Lexis 14342 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*Thomas v. Casford*, 1961 OK 158, 363 P. 2d 856 . . . . . . . . . . . . . . . . . . . . . . . . . 12-14

*Thomas v. International Business Machines*,
48 F. 3d 478, 485 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744,
151 L.Ed.2d 740 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*United States v. Cortez-Galiviz*, 495 F. 3d 1203, 1206 (2007) . . . . . . . . . . . . . . . . . 23-25

*United States v. King*, 990 F. 2d 1552,
1560 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Melendez-Garcia*, 28 F. 3d 1046, 1051 (10th Cir. 1994) . . . . . . . . . 24, 25

*Williams v. Lee Way Motor Freight, Inc.*,
1984 OK 64, 688 P. 2d 1294, 1295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wilson v. Meeks*, 52 F. 3d 1547 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

## PARTIAL MOTION FOR SUMMARY JUDGMENT
## OF THE DEFENDANT OFFICERS AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Officers Bemo, Brown, Nelson, Cooper, and Blumenthal request the court grant summary judgment on certain issues is this case.  Specifically, all of the Defendant Officers request summary judgment on the First Claim for Relief, which is the state law claim for the tort of "outrage." Officer Blumenthal requests summary judgment on the Second Claim for Relief, which is the 42 U.S.C. §1983 claim for violation of Plaintiff's civil rights.[1]  Finally, Officer Bemo requests summary judgment on the Third Claim for Relief, which is the state law claim for tortious interference.  He is the only defendant on this claim.

Officers Bemo, Brown, and Nelson recognize Plaintiff's Second Claim for Relief presents a jury question with respect to their alleged use of excessive force against Plaintiff. Similarly, while Lt. Cooper is not alleged to have used any force against Plaintiff personally, the question of whether he observed and could have prevented excessive force is arguably a question for the jury.  However, these defendants request summary judgment on the other constitutional issues raised in the Second Claim for Relief, specifically the alleged failure to provide medical attention and the illegal stop and seizure.  There are no material issues of fact with respect to the claims and issues identified above,  and therefore the Defendant Officers are entitled to judgment as a matter of law.   A brief in support of this motion for partial summary judgment is attached.

------

[1]Because Officer Blumenthal is named only in the First and Second Claims, granting this motion would remove him from the case.

## BRIEF IN SUPPORT OF PARTIAL
## MOTION FOR SUMMARY JUDGMENT

On July 3, 2010, at approximately 1:00 a.m., Karen Hunter called 911 and reported that her "ex-boyfriend" was blocking her car with his truck and would not let her leave the Oak Creek Apartments. She identified herself by name, described her vehicle as a Honda Accord, told the 911 operator she felt "threatened," and gave a fairly detailed description of Plaintiff Christopher Tucker and the truck he was driving. She then hung up on 911.

Defendant Officer Lance Bemo responded to this call, and Officer Matthew Nelson advised dispatch he would back Officer Bemo on the call. As Officer Bemo was approaching the apartment complex, he saw a blue truck at the exit to the complex with a Honda behind it. Officer Bemo turned on his emergency lights, and made a U-turn to follow the truck. He wanted to talk to the driver about the reported domestic dispute and make sure no one was injured. Officer Bemo advised dispatch he was following the suspect. When Tucker did not pull over, Officer Bemo turned on his siren. Defendant Officer Nelson, who was behind Officer Bemo, also had his lights and sirens engaged. Ms. Hunter continued to follow Tucker and Officer Bemo, and called 911 again. She advised the 911 operator her boyfriend was "sick" several times, and said "tell them not to hurt him, he is sick."

Tucker drove more than two miles, including getting on then off of I-240, before finally pulling over at the Walnut Creek Shopping Center. Other officers, including Defendant Officer Brown, responded as back up. Given the nature of the call and length of the pursuit, Officer Bemo believed felony stop procedures were warranted. Officer Bemo

2

ordered Tucker to turn off the vehicle.  Officer Nelson, over his car's intercom, ordered Tucker to exit the vehicle.  After ignoring several commands from Officer Bemo and Officer Nelson, Tucker eventually did get out of the truck with his hands raised.  However, he continued to ignore commands to move away from the truck.  Instead, Tucker dropped to the ground spread eagle, which prevented the Officers from observing whether he had a gun in his waist band.  A struggle or altercation ensued, in which Tucker was tased, handcuffed and placed in Officer Bemo's police car.  It is undisputed Officer John Blumenthal did not arrive at the scene until after Tucker was placed in Officer Bemo's police car.

Tucker told the Defendant Officers he had a heart condition during the struggle, but continued to resist being handcuffed.  After being placed in the police car, he complained of chest pains.  EMSA was called and Tucker was transported to the Heart Hospital.  Tucker's EKG showed a normal sinus rhythm.  After finding no current fibrillation or symptoms caused by the tasing, the doctor released Tucker back into the custody of the police.

On May 10, 2012, Plaintiff filed his Second Amended Complaint, which includes a civil rights claim, a state law claim against all of the Defendant Officers for the "tort of outrage," and a state law claim against Officer Bemo for "tortious interference with Plaintiff's employment."  Plaintiff is not entitled to recover under Oklahoma law on either of these claims.  The Defendant Officers are entitled to summary judgment on the tort of outrage claim, as is discussed in Proposition I.  Defendant Officer Bemo is entitled to summary judgment on the claim for tortious interference with employment, as is discussed

3

in Proposition II.

Resolution of the civil rights claim is a little more complex because it encompasses multiple issues as well as multiple defendants. The Complaint alleges the Defendant Officers used excessive force against Plaintiff, failed to intervene to prevent another officer's use of excessive force, failed to provide proper medical attention for Plaintiff, and illegally seized Plaintiff without reasonable suspicion or probable cause. Officer Blumenthal is entitled to summary judgment, as is discussed in Proposition III, because he was not present when the events complained of took place. However, the allegations regarding excessive force and failure to intervene present questions of credibility which cannot be resolved on summary judgment with respect to the remaining officers. Officers Bemo, Brown, Nelson and Lt. Cooper are entitled to summary judgment on the allegation they failed to provide medical attention, as is discussed in Proposition IV. Finally, as is discussed in Proposition V, they are entitled to summary judgment on the claim of illegal seizure.

## UNCONTROVERTED FACTS

1.     On July 3, 2010, at approximately 1:00 a.m., Karen Hunter called 911 and reported that her "ex-boyfriend" was blocking her car with his truck and would not let her leave the Oak Creek Apartments. Ms. Hunter specifically told the 911 dispatcher she felt threatened. Deposition of Karen Hunter, pp. 24, 117-118, 121, relevant pages attached as Exhibit 1.

2. Ms. Hunter identified herself by name, described her vehicle as a Honda Accord, and described the truck Plaintiff Christopher Tucker was driving as a blue Dodge Ram registered in her name. She also gave a physical description of Tucker. Exhibit 1, pp. 122-123. After giving these descriptions, she hung up on 911. Exhibit 1, pp. 124.

3. Officer Bemo heard the call, which was identified by dispatch as a domestic dispute, and advised dispatch he was close and would respond. Deposition of Officer Lance Bemo, pp. 39-40, relevant pages attached as Exhibit 2. Exhibit 2, pp. 39-40. Officer Nelson advised he would also respond to back Officer Bemo. Deposition of Officer Matthew Nelson, p. 15, relevant pages attached as Exhibit 3. It is dangerous for an officer to respond to a domestic call without backup, because officers do not know what a situation entails until they arrive. Exhibit 2, p. 41.

4. As Officer Bemo was approaching the apartment complex, he saw a blue truck at the exit to the complex with the Honda following it. Officer Bemo turned on his emergency lights, and made a U-turn to follow the truck. Exhibit 2, pp. 51-52. While Officer Bemo had not received a specific report that violence had occurred, injuries are not uncommon in domestic disputes. At this point, his intent was to ask the driver about what had happened and to make sure everyone was okay; if his initial investigation revealed the dispute was verbal, rather than physical, Officer Bemo did not plan to make an arrest. Exhibit 2, pp. 52-53.

5

5.      Officer Bemo advised dispatch he was following the suspect.  When Tucker did not pull over, Officer Bemo turned on his siren.  Exhibit 2, pp. 55-56. Defendant Officer Nelson, who was behind Officer Bemo, also had his lights and sirens turned on.  Exhibit 3, p. 24.

6.      Ms. Hunter followed Tucker and Officer Bemo.  Exhibit 1, p. 127.  While following them, she called 911 again.  She advised the 911 operator several times that her boyfriend was "sick," and said "tell them not to hurt him, he is sick."  Exhibit 1, pp. 126-128.

7.      Tucker drove "probably a mile" before finally pulling over at the Walnut Creek Shopping Center.[2]  Deposition of Christopher Tucker, pp. 97-98, relevant pages attached as Exhibit 4.  His route included getting on and then off of I-240.  Exhibit 4, p. 98; Exhibit 2, pp. 56-58.

8.      Officer Bemo pulled into the shopping center and stopped approximately four car lengths behind the truck Tucker was driving.  Officer Nelson's car was to the left of Officer Bemo's car.  Exhibit 2, p. 59.  Officer Brown also arrived at the scene, and parked to the right of Officer Bemo's car.  Deposition of Officer Jurden Brown, p. 26, relevant pages attached as Exhibit 5.

9.      Because Tucker had failed to stop, Officer Bemo determined a "felony stop" was warranted.  This procedure provides more protection to officers in a potentially dangerous situation, because they verbally order the individual out of the vehicle rather than

_____

[2]The distance is actually 2.2 miles.  See, Exhibit 1, pp. 111-112, 173.

6

approaching the vehicle. Exhibit 2, pp. 59-60; Exhibit 3, pp. 28-29.

10.     Officer Nelson ordered Tucker to exit the vehicle, using his intercom. Exhibit

Exhibit 2, pp. 62-63; Exhibit 3, pp. 27-28. Tucker heard these commands. Exhibit 4, p. 100.

After an "abnormally long" time, Tucker finally exited the truck. Exhibit 3, pp. 27-28;

Tucker had his hands raised, but refused to comply with commands given by Officer Brown

to move away from the truck. Exhibit 2, p. 64; Exhibit 5, p. 29.

11.     Instead of moving away from the vehicle, Tucker dropped to the ground

"spread eagle." Exhibit 2, pp. 65-67; Exhibit 3, p. 30; Exhibit 4, p. 101; Exhibit 5, p. 29.

Tucker's intent in lying down, instead of moving away from the truck, may have been to

appear non-threatening, Exhibit 4, p. 101.   However, by refusing to comply with the

commands he was given, he actually increased the volatility of the situation.   His actions

prevented the officers from being able to visually determine whether he had a weapon in his

waistband. Exhibit 2, pp. 68, 77-78; Exhibit 3, p. 44.   A struggle or altercation ensued, in

which Tucker was tased, handcuffed and placed in Officer Bemo's police car.[3]

_____

[3]The parties' testimony regarding what happened during this period is very
different. Plaintiff testified the officers "tortured me, brutalized me, and beat me.
Specifically, he testified his head was slammed into the concrete, his hands were
"torqued up behind his back to the point where my hands were touching the back of my
head," he was tased approximately ten times, and he was kicked in the ribs. Exhibit 4, pp.
101-104.  Officers Bemo, Brown and Nelson testified Plaintiff was tased twice, after
warnings and an arc display,  because he would not relax his hands and allow the officers
to place him in handcuffs. Exhibit 2, pp. 76-82; Exhibit 3, pp. 33-34; Exhibit 5, pp. 30-37.
The Defendant Officers' testimony is consistent with the number of uses recorded by the
taser.  However, Plaintiff contends  that the taser record and most of the other police,
EMSA and hospital records in this case have been altered to support the officers'

12.     Tasers have technology inside of them which records how many times a taser has been used and for how long. Deposition of Chief William Citty, pp. 97-99. Relevant pages attached as Exhibit 6. The records for Bemo's taser use on July 3, 2010 show three uses of the taser. Exhibit 6, pp. 98-99. It is not possible for an officer to alter this record. Exhibit 6, pp. 99.

13.     During this struggle, Tucker alleges the Defendant Officers stated "We going to teach you about f***ing with Oklahoma City police. We're the f***ing Oklahoma City police, mother f***er. We'll f*** you up." Exhibit 4, p. 101.

14.     Lt. Cooper arrived at the scene after Tucker had been placed in the police car. Deposition of Lt. Cooper, pp. 16-18, 24-25, relevant pages attached as Exhibit 7. Officers Bemo and Brown confirm this testimony, and Tucker testified he had "no idea" whether the assault was over before Lt. Cooper arrived. Exhibit 2, p. 86; Exhibit 4, p. 117; Exhibit 5, p. 38. However, Ms. Hunter testified Lt. Cooper was talking to her while Tucker was still on the ground, and "should have gone over and saw what was going on." Exhibit 1, pp. 42-43, 51. Construing the evidence in the light most favorable to the plaintiff, her testimony is arguably enough to create a question of fact regarding whether Lt. Cooper observed and failed to intervene to prevent the alleged excessive force.

---

position. Exhibit 4, pp. 149, 222. Plaintiff's allegation that the records were doctored , like much of his testimony in this case, in inherently unbelievable. Nevertheless, the Defendant Officers recognize credibility is an issue for the jury, and do not ask this court to decide as a matter of law that the force used during the struggle was reasonable.

15.     Officer Blumenthal did not arrive at the scene until after Tucker was already in custody.  Deposition of John Blumenthal, p. 43, relevant pages attached as Exhibit 8; Exhibit 2, pp. 89-90.  He never touched Tucker, and neither Officer Nelson nor Officer Brown ever saw him that evening. Exhibit 2, p. 92; Exhibit 3, p. 49; Exhibit 5, p. 39.  More importantly, neither Tucker nor Hunter saw Officer Blumenthal at the scene, nor personally observed Officer Blumenthal have any physical contact with Tucker.  Exhibit 1, pp. 53-54; Exhibit 4, pp. 106-107, 116-117.   The only basis for Tucker's lawsuit against Officer Blumenthal is his allegation that Officer Bemo told Tucker that Blumenthal had kicked Tucker.  Exhibit 4, pp. 110-112.

16.     Tucker told the Defendant Officers he had a heart condition during the struggle. Exhibit 2, p. 81; Exhibit 4, pp. 103-104.  Lt. Cooper asked Tucker about his heart condition, and called EMSA. Exhibit 7, p. 23.  Although suspects are normally just taken to the nearest hospital, Lt. Cooper asked  EMSA to comply with Tucker's request to be taken to the Oklahoma Heart Hospital.  Exhibit 7, p. 23.

17.     Tucker was examined at the Oklahoma Heart Hospital by Dr. David Long. See, Emergency Room Report, attached as Exhibit 9.  Tucker's EKG showed a normal sinus rhythm.  Exhibit 9, p. 2.  After finding no current fibrillation or symptoms caused by the tasing, Dr. Long released Tucker back into the custody of the police.  Exhibit 9, p. 2.[4]

---

[4]This was actually Tucker's second emergency room visit during Dr. Long's shift. Prior to the incident which is the subject of this lawsuit, Tucker had visited the emergency room complaining of panic attacks and depression. Exhibit 9, p. 1.

18.     The morning after the incident, Officer Bemo contacted CLEET (Council of Law Enforcement and Training) and advised them that he believed Tucker was dangerous and that his armed security guard license should be suspended.   Exhibit 2, pp. 100-103. CLEET did not revoke or suspend Tucker's CLEET certification.  Exhibit 4, pp. 166.

19.     On October 12, 2010, after a bench trial in Municipal Court, Tucker was convicted of Interference With Official Process, Failure to Obey Lawful Commands.  See, September 30, 2011 Opinion of the Oklahoma Court of Criminal Appeals, attached as Exhibit 10.   Tucker, Ms. Hunter and Officer Bemo all testified at trial, and Officer Bemo was cross-examined by defense counsel.  See, Defendant City's Brief in Support of Its Motion for Summary Judgment (Doc. No. 60), at p. 17.  Tucker filed a Motion for New Trial, arguing ineffective assistance of counsel and also raising the issue of whether reasonable suspicion existed to justify the stop.  After hearing argument on both issues, the Municipal court overruled Plaintiff's Motion for New Trial.  See, Transcript of November 9, 2010 Hearing, attached as Exhibit 106 to  Defendant City's Brief in Support of Its Motion for Summary Judgment (Doc. No. 60).  Tucker's  conviction was affirmed by the Oklahoma Court of Criminal Appeals on September 30, 2011.  Exhibit 10, p. 2.

20.     On October 2, 2012, Plaintiff was terminated from his position as a security guard for Norman Regional Hospital. Exhibit 4, pp. 160-161. Tucker was told he was being terminated because he did not have any first emergency response training, but believes the real reason for his termination was that Officer Bemo contacted Norman Regional Hospital.

Exhibit 4, pp. 44-57, 160-161.  There is no evidence to support this claim.  Officer Bemo

testified in his deposition that he never contacted anyone at Norman Regional Hospital

regarding Tucker.  Exhibit 2, p. 99.  Additionally, Tucker's supervisor, Cleat Thompson,

testified that he was never contacted by Officer Bemo or any other Oklahoma City Police

Officer regarding the incident in July of 2010.  See, Affidavit of Cleat Thompson, attached

as Exhibit 11.

**PROPOSITION I**

**THE DEFENDANT OFFICERS ARE ENTITLED
TO SUMMARY JUDGMENT ON THE STATE LAW
CLAIM FOR THE TORT OF OUTRAGE**

The tort of outrage is more commonly referred to as intentional infliction of emotional

distress.  The rationale behind the tort of outrage is that some behavior is so far outside the

bounds of what will be tolerated in a civilized society that it should be actionable even if it

does not fit within the scope of traditional tort categories such as assault, false imprisonment,

or trespass.  *Breeden v. League Services Corporation*, 1978 OK 27, 575 P. 2d 1374, 1376.

It is the trial court's responsibility to make the initial determination of whether the

defendants' conduct may reasonably be regarded as sufficiently extreme and outrageous to

satisfy the narrow standards set out in §46 of the Restatement (Second) of Torts.  *Gaylord

Entertainment Company v. Thompson*,  1998 OK 30, 958 P. 2d 128, 149.  Conduct which,

though unreasonable, is neither "beyond all possible bounds of decency" in the setting in

which it occurred, nor is one that can be "regarded as utterly intolerable in a civilized

11

community" is not actionable. *Id.*

Plaintiff Tucker's First Cause of Action parrots the general language of *Breeden* but does not specify which actions taken by which Defendant Officer fall outside the bounds of decency or why. See, Second Amended Complaint, attached as Exhibit 12. To the extent Tucker is referring to the alleged "beat down," see Exhibit 10, ¶27, recovery is barred by the one year statute of limitations governing assault and battery claims set forth in 12 O.S. §95(A)(4). As a general rule, intentional infliction of emotional distress is governed by the two year statute of limitations set forth in 12 O.S. §95(A)(3). *Williams v. Lee Way Motor Freight, Inc.*, 1984 OK 64, 688 P. 2d 1294, 1295. However, as the Oklahoma Supreme Court recognized in *Thomas v. Casford*, 1961 OK 158, 363 P. 2d 856, a plaintiff cannot extend the statute of limitations on an assault and battery claim by attempting to reframe it as intentional infliction of emotional distress.

In *Thomas*, the plaintiff made repairs to the defendant's car, but would not release the car to the defendant until the bill was paid. The plaintiff asserted the defendant became angry, and punched him in the head causing substantial injuries and damages including hospital bills and loss of income. *Id.* at 857. The defendant asserted the claim was barred by §95(4), but the plaintiff argued he was not suing for the assault but for the injuries, and that therefore the appropriate statute of limitations was the two year statute of limitations of §95(3) governing "injury to the rights of another. . .not otherwise enumerated." *Id.* at 858. The Oklahoma Supreme Court rejected this end run around the statute of limitations, holding

12

that injury or damage is an element of a cause of action and is not of itself a cause of action. The cause of action was one for assault and battery, and was barred by §95(4). *Id.*

The Oklahoma Court of Civil Appeals relied on *Thomas* in *Kimberly v. DeWitt*, 1980 OK CIV APP 2, 606 P. 2d 612, in which the plaintiff's decedent died as a result of a beating at a restaurant. The plaintiff sued the individuals involved in the fight, the restaurant and a restaurant employee. With respect to the individuals who caused the injuries, the petition alleged "gross negligence and violence." *Id.* at 614. *Kimberly* rejected this attempt to reframe the tort as something other that assault and battery, and held the claim was barred by the one year statute of limitations.[5] The substance of the pleading and the nature of the issues, rather than plaintiff's designation of the cause of action is controlling for statute of limitation purposes. *Id. Kimberly* states:

> The first issue raised is what causes of action were pleaded against which defendants. Though the petition alleges "gross negligence and violence" against Cranston, DeWitt, Pollard, and the Maggards, the substance of the pleading states only a cause of action for assault and battery. What controls is not the pleader's designation of the nature of the cause of action; rather, it is the substance of the pleading and the nature of the issues raised thereby. Allegations similar to the ones made against these defendants were held to state a cause of action for assault and battery in <u>Thomas v. Casford, Okl., 363 P.2d 856, 857</u> (syllabus). Thus, against these defendants a cause of action for assault and battery was pleaded. (some citations omitted) *Kimberly* at 614.

---

[5]Plaintiff was still allowed to recover some damages under the wrongful death statute, but damages based on the decedent's pain and suffering were time barred by the one year statute of limitations for assault and battery.

13

Apart from the alleged assault, the conduct most likely to be considered outrageous is the alleged profanity used by the Defendant Officers. See, Exhibit 4, p. 101; Exhibit 10, ¶17. Such statements, if made, were far from appropriate. However, as *Breeden* recognizes, Plaintiffs must tolerate a certain degree of "rough language" and the use of profanity or obscenities does not, in and of itself, rise to the level of intentional infliction of emotional distress. *Id.* at 1376-1377. In *Breeden,* the plaintiff was called a "damned deadbeat" and a "g*d damned liar," but this was not deemed sufficiently outrageous to support recovery for intentional infliction of emotional distress. *Id.* at 1376.

More recently, in *Miner v. Mid-America Door Company*, 2003 OK CIV APP 32, 68 P.3d 212, the plaintiffs alleged they were subjected to regular verbal abuse and physical threats, and called demeaning and humiliating names that focused on their masculinity and genitalia. *Id.* at 214. As in the instant case, motherf***er was one of the obscenities allegedly used. Despite finding this conduct was sufficient to create a question of fact regarding whether the plaintiffs had been subjected to a hostile work environment under Title VII, the court found the statements were not sufficiently outrageous to support liability for intentional infliction of emotional distress. *Id.* at 219, 223. Under the analysis of *Breeden, Thomas, Kimberly* and *Miner*, the Defendant Officers are entitled to summary judgment on the claim for the tort of outrage.

## PROPOSITION II

## DEFENDANT OFFICER BEMO IS ENTITLED
## TO SUMMARY JUDGMENT ON THE STATE LAW
## CLAIM FOR TORTIOUS INTERFERENCE

To prove a claim of tortious interference with business relations, a plaintiff must prove three elements.   First, he must identify a business or contractual right that was interfered with.  Second, he must show the interference was malicious and wrongful and was neither justified, privileged nor excusable.  Third, he must show damage proximately caused by interference. *Cohlmia v. Cardiovascular Surgical Specialists Corp.*, 693 F. 3d 1269, 1285 (10th Cir. 2012); *Champagne Metals v. Ken-Mac Metals, Inc.,* 458 F. 3d 1073, 1093 (10th Cir. 2006); *Brown v. State Farm Fire and Cas. Co.,* 2002 OK CIV APP 107, 58 P.3d 217, 223. In the instant case, Tucker cannot establish all three of these elements with respect to either his CLEET license or his employment with Norman Regional Hospital.

With respect to CLEET, the first element is arguably met, because Officer Bemo did contact CLEET.[6]  However, the third element is not met because Tucker did not suffer any damage as a result of this contact. As Tucker admitted, he did not lose his CLEET certification.  Exhibit 4, p. 166.

---

[6]Officer Bemo would argue this contact with CLEET was justified, rather than malicious. As a police officer, he has a duty to protect the public from individuals he has reason to believe are dangerous.  However, the court does not have to resolve the second element of a tortious interference to grant summary judgment in the instant case.

15

With respect to Norman Regional Hospital, Tucker cannot establish any of the elements of tortious interference against Officer Bemo. Officer Bemo did not contact anyone at Norman Regional Hospital, and did not ask anyone to contact the hospital on his behalf. Exhibit 2, p.99. Moreover, Tucker's supervisor, Cleat Thompson, stated in an affidavit that he had not had any conversations with any Oklahoma City Police Officer regarding Tucker. Exhibit 9. Thus, even if Tucker can establish economic damage as a result of his termination, there is no evidence that this damage was caused by any action taken by Officer Bemo.

Tucker dismisses Thompson's affidavit as a lie, based on several layers of hearsay. He testified that some of his coworkers had heard someone from hospital dispatch say they were contacted by someone at the Oklahoma City Police Department. Exhibit 4, pp. 49-54. If this contact was made, it was sometime in 2010; nearly two years before his termination. Exhibit 4, p. 50. As the Tenth Circuit recognized in *Jamarillo v. Colorado Judicial Department*, 427 F. 3d 1303, 1313 (10th Cir. 2005), hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment. *Jamarillo* relies on *Thomas v. International Business Machines*, 48 F. 3d 478, 485 (10th Cir. 1995), which holds that a third party's description of a witness' supposed testimony is not "suitable grist for the summary judgment mill." Therefore, Officer Bemo is entitled to summary judgment on the claim for tortious interference under the analysis of *Cohlmia*, *Champagne Metals*, *Brown,* and *Jamarillo.*

## PROPOSITION III

### DEFENDANT OFFICER BLUMENTHAL IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM FOR CIVIL RIGHTS VIOLATIONS UNDER §1983

In order to recover against a defendant under §1983, a plaintiff must show the defendant personally participated in the violation of the plaintiff's civil rights. *Jenkins v. Woods*, 81 F.3d 988, 994 (10th Cir. 1996), citing *Bennett v. Passic*, 545 F.2d 1260 (10th Cir.1976).  An officer may be liable for excessive force used by another officer only if the first officer knew of the excessive force and had a realistic opportunity to intervene but failed to do so. *Reid v. Wren*, 57 F.3d 1081, 1995 U.S. App. Lexis 14342 (10th Cir. 1995); *Colton v. Smotherman*, 2006 WL 222499 (W.D.Okla.) ("Before liability can attach there must be an opportunity for knowledge and an opportunity to intervene.")

In the instant case, the uncontroverted facts show Officer Blumenthal was not present when the alleged use of excessive force occurred.  He did not arrive at the scene until after Tucker was already in custody.  Exhibit 8, p. 43.  Neither Tucker nor Hunter saw Officer Blumenthal at the scene, nor personally observed Officer Blumenthal have any physical contact with Tucker.  Exhibit 1, pp. 53-54; Exhibit 4, pp. 106-107, 116-117.   Tucker specifically testified he did not see Officer Blumenthal use a stun gun, participate in the alleged beating, or use excessive force.  He also testified Officer Blumenthal did not detain him.

The only basis for Tucker's lawsuit against Officer Blumenthal is his allegation that Officer Bemo told Tucker that evening that Blumenthal had kicked Tucker. Exhibit 4, pp. 110-116. However, Officer Bemo testified in his deposition that Blumenthal arrived as Tucker was being escorted to the car, and never touched Tucker. Exhibit 2, pp. 89, 92. Officer Bemo will also be present to testify at trial, so there is no basis to admit hearsay testimony regarding his statements at the scene. Under *Jamarillo*, hearsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment.

As the Tenth Circuit recognized in *Blossom v. Yarbrough*, 429 F. 3d 963, 966 (10th Cir. 2005), a non-moving party's failure to admit a material fact does not in and of itself create a disputed fact. It is "plainly wrong" to equate the refusal to admit with the affirmative submission of conflicting evidence. *Id.* Thus, *Blossom* holds:

> Deputy Yarbrough makes a persuasive case that the district court allowed Ms. Blossom to proceed to trial merely by refusing to admit that there is no countervailing evidence that her son lunged. Of course, Ms. Blossom has no personal knowledge of the events in question. In equating the refusal to admit with the affirmative submission of conflicting evidence, the district court was plainly wrong. From a jurisdictional perspective, *the question is whether a plaintiff may create a genuine issue of material fact by merely refusing to admit the facts which defendant supports by undisputed evidence without herself presenting any conflicting facts.* Though *the substantive answer is obvious*, we need not determine whether this question is a jurisdictionally permissible abstract question of law that may be resolved in a qualified immunity appeal. Instead, we resolve the case on Deputy Yarbrough's second argument, that the shooting was objectively reasonable notwithstanding the district court's identification of various disputed facts. (emphasis added, citations omitted) *Blossom* at 966.

In short, Tucker cannot avoid summary judgment by arguing it is possible Officer Blumenthal used excessive force, even if there are no witnesses who can testify to that fact. Therefore, Officer Blumenthal is entitled to summary judgment on the §1983 claim under the analysis of *Jenkins, Reid, Colton, Jamarillo*, and *Blossom.*

## PROPOSITION IV

### THE DEFENDANT OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT ON THE §1983 CLAIM FOR FAILURE TO PROVIDE PROPER MEDICAL ATTENTION

It is undisputed the Defendant Officers summoned medical assistance in the instant case when Tucker told Lt. Cooper he had a heart problem.  Not only did Lt. Cooper call EMSA, he also requested that EMSA transport Tucker to the hospital Tucker had requested, the Oklahoma Heart Hospital.  Exhibit 7, p. 23.  This is sufficient to satisfy the Defendant Officers' constitutional obligations under *Wilson v. Meeks*, 52 F. 3d 1547 (10th Cir. 1995).

In *Wilson,* the defendant officers shot and then handcuffed the plaintiff's decedent. Although the officers called an ambulance, no officer gave Mr. Wilson medical care or first aid before the arrival of the fire department (EMTs).  *Id.* at 1550.  The parties do not dispute that during this time Mr. Wilson was lying face down and breathing. The Tenth Circuit held police officers have no duty to administer, as well as summon, medical assistance even if the officers are trained in CPR.  *Id.* at 1555. The Tenth Circuit did leave open the possibility that officers may in certain circumstances have a duty to render first aid, which it defined as a limited form of intervention with the immediate goal of preventing death by attending to

19

airways, breathing and circulation. *Id.* Tucker was breathing on his own in the instant case, and there was no necessity for first aid prior to the arrival of EMSA.

To the extent Tucker is alleging the defendant officers were required to stop their attempts to handcuff him once he advised them he had a heart condition, this argument is also foreclosed by *Wilson.* The court noted that "the first duty of a police officer is to ensure the safety of the officers and the public." *Id.* at 1556. Handcuffing is a necessary expedient to this end. *Id.*

Even with respect to defendants who do have an affirmative duty to provide medical care, such as prison medical personnel, a delay in providing medical care rises to the level of a constitutional violation only when the plaintiff can show the delay resulted in substantial medical harm. *Oxedine v. Negron*, 241 F. 2d 1271, 1276 (10th Cir. 2001). Tucker did not sustain substantial medical harm as a result of any delay by the Defendant Officers in providing medical care in the instant case. The emergency room doctor found Tucker had a normal heart rhythm and no symptoms from the tasing. Exhibit 9, p. 2. Under the analysis of *Wilson* and *Oxedine,* the Defendant Officers are entitled to summary judgment on the §1983 claim for failure to provide proper medical care.

## PROPOSITION V

## THE DEFENDANT OFFICERS ARE ENTITLED
## TO SUMMARY JUDGMENT ON THE §1983 CLAIM
## FOR ILLEGAL SEIZURE

The basis for Tucker's illegal seizure claims seems to be that the Defendant Officers lacked reasonable suspicion to believe a crime had been committed when Officer Bemo first began to follow Tucker's truck. This claim fails for two reasons.

First, the illegal seizure claim fails because Tucker's municipal conviction for Interference With Official Process precludes Tucker from arguing he did not commit any crime. Under *Hubbert v. Moore*, 923 F. 2d 769, 773 (10th Cir. 1991), the question of probable cause is conclusively determined at a preliminary hearing when a party has had a full and fair opportunity to litigate that issue. This standard is met where the party or his counsel has an opportunity to present evidence, review evidence the prosecution presented, and cross-examine the witnesses against him. *Id.*[7] In the instant case, Tucker presented his own testimony and that of Ms. Hunter, and cross-examined Officer Bemo at his municipal trial. At a subsequent hearing on his motion for new trial, Tucker's counsel specifically argued that Officer Bemo lacked reasonable suspicion to pursue Tucker. See, Transcript of November 9, 2010 Hearing, attached as Exhibit 106 to Defendant City's Brief in Support of Its Motion for Summary Judgment (Doc. No. 60). Therefore, the Defendant Officers are

---

[7]If probable cause and be preclusively established at a preliminary hearing, it can certainly be established at an actual trial.

21

entitled to summary judgment on the illegal seizure claim on the grounds of collateral estoppel.

Second, even if the court is willing to consider the substantive issue of whether the stop was based on reasonable suspicion, the Defendant Officers are entitled to summary judgment on the grounds of qualified immunity because there is no clearly established law prohibiting a pursuit and investigatory detention in these circumstances. As the Supreme Court recognized in *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot, based on the totality of circumstances. The totality of circumstances officers may consider includes information learned from other officers. *Oliver v. Woods*, 209 F.3d 1179, 1191 (10th Cir. 2000)("[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and ... officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information.") Additionally, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Arvizu* at 750.

The totality of circumstances may include behavior that has a potentially innocent explanation. For example, in *Oliver,* citing *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the Tenth Circuit held flight from the scene of an investigation in

a high crime area, although it may also be consistent with innocence, is the type of circumstance which may give rise to reasonable suspicion of criminal activity sufficient to support a *Terry* stop. Under *United States v. Cortez-Galiviz*, 495 F. 3d 1203, 1206 (2007), the reasonable suspicion standard requires an officer to have some minimal level of objective justification, but does not require that the officer be able to rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for a traffic stop. The resolution of particularized and objective yet still ambiguous—potentially lawful, potentially unlawful—facts is the central purpose of an investigative detention. *Id.*  In other words, as *Cortez-Galiviz* summarizes the issue, "Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further." *Id.* at 1207.

Even in the absence of suspicion of criminal activity, officers may detain an individual when necessary to ensure the safety of the public and/or the individual. *Gallegos v. City of Colorado Springs,* 114 F. 3d 1024 (10th Cir. 1997), *Gallegos* at 1029, n. 4.  This duty to check on an individual's welfare is part of police officers' "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.,* citing *United States v. King*, 990 F. 2d 1552, 1560 (10th Cir. 1993).

In the instant case, Officer Bemo knew based on years of experience that domestic disputes are inherently volatile and potentially dangerous. Although he may not have known exactly what if any crime had occurred at the Oak Creek Apartments, he had reasonable suspicion to believe some criminal behavior might have occurred. This suspicion was strengthened when Tucker failed to stop. When Ms. Hunter called 911 and repeatedly stated Tucker was "sick," a reasonable officer would also have concluded he had a duty to check on Tucker's welfare. No single piece of the information known by the Defendant Officers, standing alone, created probable cause for arrest, but the totality of the circumstances demonstrated further investigation was necessary before the 911 calls could be summarily dismissed as harmless. As *Cortez-Galiviz* recognizes, the very purpose of an investigatory detention is to resolve the legality of criminally ambiguous circumstances.

The fact that felony stop procedures were employed does not render the seizure inherently illegal. Under *United States v. Melendez-Garcia*, 28 F. 3d 1046, 1051 (10th Cir. 1994), police officers are not be required to take unnecessary risks in performing their duties and are therefore authorized to take such steps as are reasonably necessary to protect their personal safety during an investigative detention. It is beyond dispute that the safety of law enforcement officers during the performance of their duties is a legitimate and weighty concern; therefore officers may take whatever steps are reasonably necessary during an investigative detention to protect their personal safety and to maintain the status quo. *Novitsky* at 1254. The steps an officer may permissibly take to protect their safety include

24

drawing a weapon, placing a suspect in handcuffs, or forcing a suspect to the ground.  *Id.* Under the analysis of *Arvizu*, *Oliver*, *Cortez-Galiviz*, and *Melendez-Garcia*, the Defendant Officers are entitled to summary judgment on the §1983 claim for illegal seizure.

## CONCLUSION

As explained in this brief, the only claims requiring submission to a jury are the §1983 claims for excessive force against Defendant Officers Bemo, Brown, Nelson and Cooper. These Defendant Officers are entitled to summary judgment on the state law claims, the §1983 claim for failure to provide medical assistance, and the §1983 claim for illegal seizure.  Defendant Officer Blumenthal is entitled to summary judgment on all claims, because there is no evidence he was present when any excessive force was used.

Respectfully submitted,

/s/ Stacey Haws Felkner
Susan Ann Knight, OBA #14594
Stacey Haws Felkner, OBA #14737
Manchester & Knight, PLLC
One Leadership Square, Suite 800 N
211 North Robinson
Oklahoma City, Oklahoma, 73102
Telephone: (405)235-4671
Facsimile:  (405)235-5247
Attorneys for Defendants, Oklahoma City Police
Officers Lance Bemo, Jurden Brown, Mathew
Nelson, Jeff Cooper and John Blumenthal

## CERTIFICATE OF MAILING

This is to certify that on this 11th day of January, 2013, a true and correct copy of the above and foregoing was served on the following, who are registered participants of the ECF System:

Blake Sonne
Sonne Law Firm, PLC
P.O. Box 667
Norman, OK 73070

Richard C. Smith
Municipal Counselor's Office
City of Oklahoma City
200 North Walker, Suite 400
Oklahoma City, OK 73102                    /s/ Stacey Haws Felkner
                                           Stacey Haws Felkner