IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

CHRISTOPHER L. TUCKER,                 )
                                       )
                  Plaintiff,           )
                                       )
v.                                     )   Case No. CIV-11-922-D
                                       )
CITY OF OKLAHOMA CITY, *et al.*,       )
                                       )
                  Defendants.          )

**O R D E R**

Before the Court are Defendant City of Oklahoma City's Motion for Summary Judgment

[Doc. No. 57] and the Partial Motion for Summary Judgment of the Defendant Officers [Doc.

No. 65], filed pursuant to Fed. R. Civ. P. 56.  The Motions seek a judgment as a matter of law in

favor of, respectively, the City of  Oklahoma City (the "City") on all claims asserted in the Second

Amended Complaint, and the individual defendants on all claims except one.  Plaintiff Christopher

Tucker has timely opposed the Motions, which are fully briefed and at issue.[1]  Because the Motions

raise overlapping issues, they are taken up together.

**Factual and Procedural Background**

Plaintiff brings suit under § 1983 and state law for injuries allegedly suffered during an

encounter with officers of the Oklahoma City Police Department ("OCPD").  He has sued the City

and five individual police officers.  After responding to a 911 call, the encounter with Plaintiff began

when police officers signaled Plaintiff to stop the vehicle he was driving on July 3, 2010, and then

arrested him after he exited the vehicle.  Plaintiff claims the officers conducted an "illegal police

stop" and seizure in violation of the Fourth Amendment because they lacked reasonable suspicion

---

[1] Plaintiff filed a response to each motion [Doc. Nos. 71 & 72], and reply briefs were filed by both
the City [Doc. No. 73] and the individual defendants [Doc. No. 74].

or probable cause that he had committed any crime. *See* Second Am. Compl. [Doc. No. 35], ¶¶ 15-16, 29. He alleges that a "felony stop" was "made for investigatory purposes" based on an "unverified or anonymous tip." *Id*. ¶¶ 16, 29. Plaintiff also claims the officers used excessive force in effecting his arrest, and denied him access to medical care in violation of his right to due process under the Fourteenth Amendment. *Id*. ¶¶ 17-19, 29.[2] As to the City, Plaintiff alleges OCPD failed to adequately train and supervise its officers with regard to the conduct committed. *Id*. ¶¶ 22-24. Also, Plaintiff alleges one officer contacted his employer after the incident and caused Plaintiff to be fired from his job as a security guard. The Second Amended Complaint asserts three claims: 1) a tort claim of outrage against the OCPD officers named as individual defendants; 2) a § 1983 claim against all defendants for alleged violations of Plaintiff's constitutional rights; and 3) a claim of tortious interference with contractual relations against the officer who allegedly contacted Plaintiff's employer.

## Standard of Decision

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A genuine issue exists if the evidence is such that a reasonable jury could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id*. If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim,

---

[2] Plaintiff cites the Eighth Amendment in his pleading. While the Eighth Amendment provides the appropriate constitutional standard, the Due Process Clause of the Fourteenth Amendment applies to a pretrial detainee. *See* Order of Jan. 25, 2012 [Doc. No. 26] at 3-4.

all other factual issues concerning the claim become immaterial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of a dispute of material fact warranting summary judgment.  *Celotex*, 477 U.S. at 322-23.  If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial.  *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671; *see* Fed. R. Civ. P. 56(c)(1)(A).  A district court has discretion to go beyond the cited materials and consider other materials in the record, but it is not required to do so.  *See Adler*, 144 F.3d at 672; Fed. R. Civ. P. 56(c)(3).  The court's inquiry is whether the facts and evidence of record present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### Statement of Undisputed Facts [3]

Plaintiff's girlfriend, Karen Hunter, dialed 911 from her cell phone three times on July 3, 2010.  In the first call at approximately 1:00 a.m., Ms. Hunter reported that her "boyfriend" or "ex-boyfriend" was blocking her car with his truck and would not let her leave the parking lot of the Oak Creek Apartments at 5909 South Lee in Oklahoma City.  *See* Def. City's Br. Supp. Mot. Summ. J.,

---

[3] This statement includes material facts presented by all parties that are supported as required by Fed. R. Civ. P. 56(c)(1).  If a party has asserted a fact, or asserted that a fact is disputed, but has failed to provide necessary support, the assertion is disregarded.  All facts are stated in the light most favorable to Plaintiff.

Ex. 10 [Doc. No. 61] (conventionally filed CD), audio recording of 911 calls.[4] Ms. Hunter identified

herself by name, gave the make and model of her vehicle, described the truck Plaintiff was driving

as a blue Dodge Ram pickup registered in her name, and gave a physical description of Plaintiff.

Ms. Hunter stated that she felt threatened, stopped responding to the dispatcher's questions, and

abruptly terminated the call.  The dispatcher who received the emergency call designated it as a

domestic dispute.

Defendant Lance Bemo, an officer employed by OCPD for more than seven years at the time

of the incident, heard the radio call and advised the dispatcher that he was close to the location and

would respond.  Defendant Matthew Nelson, an officer employed by OCPD for approximately three

years at the relevant time, advised that he would respond as backup to Officer Bemo.  It is not

uncommon for two police officers to respond to domestic calls, which may involve volatile

situations.

Officer Bemo observed the blue pickup truck westbound on Southwest 59th Street near Lee

Avenue, and made a U-turn to follow it.  The parties dispute whether Officer Bemo immediately

activated the emergency lights on his patrol car, or whether he waited until the pickup had turned

onto Western Avenue to activate his lights.  It is undisputed, however, that Plaintiff did not stop his

pickup after emergency lights were activated but, instead, continued driving for more than a mile.[5]

When Plaintiff did not stop, Officer Bemo activated his siren; Officer Nelson (behind Officer Bemo)

---

[4]  The accuracy of the audio recordings is undisputed; in fact, Plaintiff has offered a computer disk
containing copies of the recordings as his own exhibit.  *See* Pl.'s Resp. City's Mot. Summ. J., Ex. 38; Pl.'s
Resp. Officers' Mot. Summ. J., Ex. 2. To the extent Ms. Hunter later testified in a manner that is inconsistent
with the audio recordings, the Court finds Ms. Hunter's testimony does not create a genuine dispute regarding
her statements to the 911 dispatcher.  *See Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (facts
clearly shown by a videotape of the incident cannot be disputed); *see also Scott v. Harris*, 550 U.S. 372,
380-81 (2007) (facts must be viewed "in the light depicted by the videotape" of events).

[5]  By Defendants' account, Plaintiff continued driving for more than two miles.

4

also activated his emergency lights and siren.   During the pursuit, Plaintiff traveled south on

Western Avenue, entered onto westbound Interstate I-240, exited the highway at Pennsylvania

Avenue, and turned north on Pennsylvania Avenue before pulling into the parking lot of a shopping

center.   Plaintiff did not drive with excessive speed or take evasive action, and he obeyed traffic

signals.   However, he failed to stop for the police officers or yield to their emergency vehicles.

Ms. Hunter was following Plaintiff and Officer Bemo in her vehicle.   After the pursuit began,

she called 911 a second time, stating several times that Plaintiff was "sick" and instructing the

dispatcher to "tell them not to hurt him, he is sick."   *See id.*[6]

When Plaintiff stopped his vehicle, Officer Bemo pulled into the parking lot behind him, and

stopped approximately four car-lengths away from the pickup.   Officer Nelson stopped his car to

the left of Officer Bemo, and a third officer, Jurden Brown, arrived and parked to the right of Officer

Bemo's car.   Officer Brown had been employed by OCPD for more than six years at the time of

these events.   Officer Bemo decided to do a "felony stop" for officer safety due to the uncertainty

of the situation.   A "felony stop" utilizes procedures designed to protect officers from potential

danger in a traffic stop; a driver is verbally ordered to exit his vehicle and to move away from it.

Using the intercom on his patrol car, Officer Nelson ordered Plaintiff to exit the pickup.   It

is undisputed that Plaintiff did not immediately comply, but the parties dispute whether Plaintiff

simply refused or whether he was attempting to comply but was delayed by the limited use of his

left hand, which had recently undergone surgery.   After Plaintiff exited the vehicle, he failed to

follow subsequent verbal commands.   Instead of moving away from the pickup, Plaintiff dropped

to the ground and laid down "spread eagle."   *See* Tucker Dep. 101:14-17.   It is disputed whether

---

[6] Ms. Hunter apparently made her third call during the pursuit or, perhaps, after Plaintiff had stopped.
During this call, Ms. Hunter pleaded for officers not to hurt her boyfriend and ended the call with screams.

Plaintiff's actions were the result of confusion, due to the number of commands being given and the number of officers present, or whether he simply chose not to comply with the officers' instructions. Also, the details of ensuing events – during which Plaintiff was taken into custody, handcuffed, and placed into Officer Bemo's patrol car – are hotly contested.   It is undisputed, however, that a struggle or altercation occurred and that a taser was used.  According to Officers Bemo, Brown and Nelson, Officer Bemo warned Plaintiff, did an arc-display with the taser he carried, and then touch-tased Plaintiff twice because he was actively resisting efforts to place him in handcuffs.  According to Plaintiff and Ms. Hunter, the officers brutally attacked Plaintiff using physical blows and profanity, employed a taser without warning, and discharged it several times into Plaintiff's back.

A taser has technology that creates a record of how many times the taser is activated and how long it is activated.  The report generated from the taser carried by Officer Bemo showed that it was discharged three times on July 3, 2010:  five seconds at 1:08:59; five seconds at 1:09:05; and nine seconds at 1:09:15.  An officer cannot alter the record generated by his taser.

Either during the struggle or after Plaintiff had been placed in the police car (the timing is disputed), Defendant Jeff Cooper, a lieutenant employed by OCPD for more than 13 years at the relevant time, arrived at the scene.  According to Ms. Hunter's testimony in support of Plaintiff's claim, Lt. Cooper was present in time to intervene and prevent other officers' use of force against Plaintiff.  Defendant John Blumenthal, a sergeant employed by OCPD for almost eleven years at the time, did not arrive until Plaintiff had been taken into custody, according to the officers' testimony. Officer Bemo has testified that Sgt. Blumenthal never touched Plaintiff.  The only evidence of Sgt. Blumenthal's involvement in the incident is Plaintiff's testimony that Officer Bemo made a remark to him on July 3, 2010, indicating that Sgt. Blumenthal had kicked Plaintiff.

6

During the struggle, and before Officer Bemo had activated one of the taser discharges, Plaintiff told the involved officers that he had a heart condition.  After Plaintiff was in custody, Lt. Cooper asked Plaintiff about his condition, called emergency medical responders, and asked them to honor Plaintiff's request to be taken to the Oklahoma Heart Hospital.  At the hospital, Plaintiff was examined by an emergency room physician, who found no current fibrillation or symptoms caused by the use of a taser.  An electrocardiogram was normal.  The physician found Plaintiff's condition to be stable, and released him to OCPD custody.

Plaintiff was cited for obstructing police officers in violation of the Oklahoma  City Municipal Code, § 30-58.  The charge was later amended to interfering with official process by failing to obey lawful commands, in violation of § 30-68.  Plaintiff received a non-jury trial in municipal court on October 12, 2010, and was convicted.  Plaintiff was represented by counsel who, among other things, did not challenge the legality of the traffic stop nor request a court reporter.  On October 22, 2010, Plaintiff, through new counsel, filed a motion for a new trial alleging ineffective assistance of trial counsel.  The municipal judge held a hearing on the motion and overruled it. Plaintiff appealed, but the Oklahoma Court of Criminal Appeals affirmed in a summary opinion, concluding as follows:

> The record supports Appellant's contention that trial counsel's representation was unreasonable under prevailing professional norms.  However, Appellant has not shown that the result would have been different but for the errors of his retained counsel.

*Tucker v. City of Okla. City*, No. M 2010-1097 (Okla. Crim. App. Sept. 30, 2011).

With the City's Motion, it has submitted police academy and in-service training records for each individual defendant, the course materials used in training, including Council on Law Enforcement Education and Training (CLEET) outlines, numerous OCPD policies and procedures,

OCPD's taser training manual at the relevant time, and OCPD's accreditation records.  None of the

facts shown by these institutional materials are disputed, and in fact, Plaintiff has submitted many

of the same training materials as exhibits to his response brief.[7]

Following the incident with Plaintiff, Officer Bemo contacted CLEET to advise the agency

that he believed Plaintiff was dangerous and Plaintiff's license as an armed security guard should

be suspended pending an investigation.  CLEET did not suspend or revoke Plaintiff's certification.

Officer Bemo has testified that he never contacted Plaintiff's employer, Norman Regional Hospital,

and Plaintiff's supervisor, Cleat Thompson, has testified that he was not contacted by Officer Bemo

or any other police officer regarding the July 2010 incident.  Plaintiff's only evidence to support his

claim that Officer Bemo contacted his employer is his own testimony that he was told by others,

including Mr. Thompson in December 2010, that someone from OCPD had contacted his place of

employment.  Plaintiff was terminated from his position as a security guard at Norman Regional

Hospital on October 2, 2012, for the stated reason that he lacked first emergency response training.

Also following the incident, Lt. Cooper conducted an investigation into the officers' use of

force against Plaintiff, in accordance with OCPD's policies and procedures.  Lt. Cooper generated

a report that has been submitted as part of the summary judgment record (as a sealed filing).  *See*

Def. City's Br., Ex. 30, Pl.'s Resp. Br., Ex. 14 [filed conventionally as Doc. No. 62].   It contains

color photographs of Plaintiff taken shortly after the incident, and narrative statements given by

officers who witnessed it.  Included within the report, and submitted as a separate exhibit by both

the City and Plaintiff, is a copy of the OCPD crime report regarding Plaintiff's arrest, which lists

his offenses as obstructing an officer, in violation of Okla. Stat. tit. 21, § 540, as well as municipal

---

[7]   The purpose of these voluminous submissions is unclear; most of the papers presented have no apparent relevance to the summary judgment issues.  The Court finds the parties' unnecessary filings to be neither helpful nor persuasive, but they instead merely burden the record.

citations for obstruction and failure to yield the right of way to an emergency vehicle. *See* Def. City's Br., Ex. 83 [Doc. No. 60-83]; Pl's Resp. Officer's Mot., Ex. 1 [Doc. No. 71-1]; Pl.'s Resp. City's Mot., Ex. 13 [Doc. No. 72-13].

By the Second Amended Complaint, Plaintiff seeks to recover compensatory damages from all defendants, and punitive damages from Officers Bemo, Brown, Nelson, Cooper, and Blumenthal, under 42 U.S.C. § 1983 for alleged violations of Plaintiff's Fourth Amendment rights to be free from an illegal seizure and the use of excessive force, and his right under the Due Process Clause of the Fourteenth Amendment to receive treatment for a serious medical need while in custody.[8]  Under state law, Plaintiff also asserts tort claims against the individual defendants (the "Officers") for intentional infliction of emotional distress, or outrage, and against Officer Bemo for interfering with Plaintiff's employment as a CLEET-certified security guard.  As to the City, Plaintiff seeks to impose municipal liability under § 1983 for the Officers' actions due to the City's alleged failure to train and supervise its police officers, and the existence of a policy or custom of deliberate indifference to police officers' improper use of excessive force against city residents, and their lack of medical attention to injured arrestees.

By the Motions regarding Plaintiff's § 1983 claims, the Officers contend summary judgment is proper 1) as to the "illegal police stop" or unlawful arrest claim, because state courts necessarily

---

[8]  Plaintiff initially claimed the Eighth Amendment was violated by the officers' conduct, but in ruling on a motion for partial dismissal, the Court determined the Eighth Amendment does not apply.  *See supra* note 2.  In its ruling, the Court was not called to determine what constitutional provision applied to Plaintiff's excessive force claim.  Under Tenth Circuit case law, however, the Fourth Amendment provides the appropriate constitutional standard.  *See Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010) ("Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment – all depending on where the defendant finds himself in the criminal justice system . . . .  [B]ecause the Fourth Amendment protects against 'unreasonable searches and seizures' and pertains to the events leading up to and including an arrest of a citizen previously at liberty, . . . the Fourth Amendment applies until formal charges are brought or an arraignment is held because force used is part of the 'seizure.'").

determined in Plaintiff's criminal case that no Fourth Amendment violation had occurred, and because the individual officers are entitled to qualified immunity, and 2) as to the denial of medical care claim, because no constitutional violation occurred; the City contends summary judgment should be granted in its favor on similar grounds and because no basis for municipal liability can be established.  In addition, Officer Blumenthal seeks summary judgment on the excessive force claim on the ground that Plaintiff lacks evidence to show he personally participated in any constitutional violation that occurred.  As to Plaintiff's state law claims, the Officers contend summary judgment is proper on all tort theories of recovery.

## Discussion

### A.    Civil Rights Claims Under § 1983

To establish a § 1983 claim against an individual defendant asserting the defense of qualified immunity, Plaintiff must show facts that "make out a violation of a constitutional right" and demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).  To establish a § 1983 claim against a municipality, Plaintiff must establish both that a constitutional violation occurred and that an unconstitutional policy or municipal act caused the violation.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  If an unconstitutional policy is established, "§ 1983 provides for the imposition of liability where there exists an 'affirmative' or 'direct causal' link between a municipal person's adoption or implementation of a policy and a deprivation of federally protected rights."  *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 2150 (2011).

### 1.      Unconstitutional Seizure

### a.      Collateral Estoppel or Issue Preclusion

As one basis for judgment on Plaintiff's § 1983 claim alleging an unlawful seizure in violation of the Fourth Amendment, Defendants assert that the claim is barred by an adverse determination of the issue during Plaintiff's criminal case.  Defendants rely on cases holding that a criminal conviction estops a person from attempting to relitigate the issue of the legality of his seizure.  *See Hubbert v. City of Moore*, 923 F.2d 769, 773 (10th Cir. 1991) (where "probable cause was fully and fairly litigated in the prior criminal proceeding [it] cannot be relitigated in [a] civil action"); *see also Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992) ("plaintiff's conviction . . . establishes the legality of the arrest and precludes relitigation of the issue in her § 1983 action").

The underlying legal basis of these decisions is federal comity.  "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  *Allen v. McMurry*, 449 U.S. 90, 96 (1980) (citing 28 U.S.C. § 1738).  Thus, "the preclusive effect of a prior state court judgment is defined by that state's law."  *Hubbert*, 923 F.2d at 772.  In *Hubbert*, a probable cause determination in an Oklahoma criminal proceeding was found to be binding on federal courts and to warrant summary judgment on a § 1983 false arrest claim because the record "reveal[ed] no genuine dispute about whether [the plaintiff] had an opportunity to fully and fairly litigate the issue" of probable cause at her preliminary hearing.  *Id*. at 773.  More recently, the Tenth Circuit has cautioned district courts to consider carefully whether collateral estoppel, or issue preclusion, should apply to an Oklahoma court's ruling in a criminal case, particularly one made in a municipal court proceeding.

In *Bell v. Dillard Department Stores, Inc.*, 85 F.3d 1451 (10th Cir. 1996), the court of appeals concluded that the doctrine of issue preclusion should not apply to a municipal court ruling for two reasons:  first, the minute entry on which the defendant relied was not signed by the municipal court judge who ruled on the issue of probable cause, "and under Oklahoma law it therefore may not be afforded preclusive effect;" and second, the Tenth Circuit could not determine from the record that the plaintiff "had a full and fair opportunity to litigate the probable cause issue in municipal court."  *Id.* at 1454.  *See also Gouskos v. Griffith*, 122 F. App'x 965, 974 (10th Cir. 2005) (defendant "bore the burden of establishing the defense of issue preclusion on the issue of probable cause" and failed to satisfy his burden).

Similarly, in this case, Defendants have not presented a minute entry signed by the municipal court judge, and it is not clear that Plaintiff had a full and fair opportunity to litigate the Fourth Amendment issue because he was represented by trial counsel whose performance was deficient. Therefore, the Court finds that Defendants have failed to establish their defense of issue preclusion as a matter of law.

### b.    Fourth Amendment Violation

The Fourth Amendment prohibits unreasonable seizures of a person by law enforcement officers.  The first question presented by Plaintiff's claim is:  When did a seizure occur?  This is a legal question, to be answered based on the totality of circumstances.  *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010).  "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991)).  An objective standard governs both issues.  *Id.*  "Because the standard is an

objective one, we consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances." *Id*. at 1065.

In *Hodari D*., 499 U.S. at 629, the Supreme Court held that a suspect being pursued by police officers was not seized because he did not stop or otherwise respond to their commands to halt and, thus, did not actually submit to their assertion of authority. Similarly, in *United States v. Harris*, 313 F.3d 1228 (10th Cir. 2002), a pedestrian was approached by a police officer and was twice asked for identification, but he ignored the officer and continued walking. The court of appeals held that the pedestrian was not seized until the police officer exerted physical force against him. *Id*. at 1235. *See also Reeves v. Churchich*, 484 F.3d 1244, 1253 (10th Cir. 2007) (plaintiffs were not seized by police officers' actions of pointing rifles and issuing orders because plaintiffs failed to comply with the orders); *Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (unsuccessful pursuit of plaintiff on interstate highway was not a seizure; plaintiff was seized when he was stopped by a roadblock).

In this case, Plaintiff did not submit to the show of authority exhibited by Officers Bemo and Nelson when they activated their emergency lights and sirens, and thus, he was not seized during their pursuit of him. A seizure occurred, at the earliest, when Plaintiff stopped his vehicle in the parking lot. However, the driver of a moving vehicle approached by a police car operating its emergency lights does not necessarily submit to the show of authority by halting his motion. In *United States v. Salazar*, 609 F.3d 1059, 1067 (10th Cir. 2010), the court of appeals concluded that a driver who remained in his pickup truck with the motor engaged was not seized until he complied with a command to get out of the vehicle. "[T]o constitute submission, 'the suspect must *clearly* acquiesce to the officer's show of authority.'" *Id*. (quoting *United States v. Letsinger*, 93 F.3d 140, 145 (4th Cir. 1996) (emphasis added in *Salazar*).

13

Similarly here, Plaintiff did not necessarily submit to the police officers' show of authority by pulling into the parking lot and remaining in his vehicle after he was instructed to exit. From the view of a reasonable police officer, this conduct could have suggested just another step in Plaintiff's effort to avoid contact with the officers – "a nascent attempt to flee, an effort to buy time so that he could dispose of contraband or formulate an explanation to provide to the officer, or simply a period of indecision before he determined what to do." *Salazar*, 609 F.3d at 1067. Under an objective view, the Court finds that Plaintiff was not seized until he emerged from the pickup truck and laid down on the ground.

The second question presented is: Did the arresting officers have a constitutionally sufficient justification for the seizure of Plaintiff? The Fourth Amendment protects an individual against unreasonable seizure, including a warrantless arrest without probable cause to believe the person has committed a crime. *See Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* at 1116 (internal quotation omitted); *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011) (same). "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." *Id.* "Police officers are entitled to rely upon information relayed to them by other officers in determining whether there is reasonable suspicion to justify an investigative detention or probable cause to arrest." *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000); *see also United States v. Hensley*, 469 U.S. 221, 231 (1985) ("effective law

enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another").

In this case, the undisputed facts show that by the time a "seizure" occurred, within the meaning of the Fourth Amendment, Plaintiff had already violated state laws requiring citizens to obey police officers' traffic signals and yield to emergency vehicles. *See* Okla. Stat. tit. 21, § 11-103 and § 11-405. At that point, OCPD officers clearly had a reasonable basis to stop Plaintiff's vehicle based on the traffic violations they had observed. *See United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) ("a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation") (internal quotation omitted). Plaintiff does not dispute that he failed to stop for Officers Bemo and Nelson; he questions only whether he was required to do so. For reasons discussed *infra*, the Court finds that he was. Plaintiff also does not dispute that he did not immediately exit the pickup truck and step away from it, as directed by the officers. Although the reasons for his actions are disputed, the test for probable cause is an objective one viewed from the perspective of "a reasonable officer . . . in a given situation." *See Koch*, 660 F.3d at 1239. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

The facts known to OCPD officers on the scene, either personally or relayed by the 911 dispatcher, and Plaintiff's actions when they ordered him to exit his stopped vehicle, established probable cause to believe that Plaintiff was committing the offense of obstructing an officer. The Court finds the circumstances presented, although factually distinguishable, to be analogous to ones discussed in *United States v. Sanchez*, 555 F.3d 910 (10th Cir. 2009), and to support a similar conclusion that the officers had sufficient grounds for an arrest. In *Sanchez*, police officers

15

executing a search warrant for a house ordered a person standing in the driveway to get down, but instead, the person (Mr. Sanchez) attempted to flee.  The court of appeals concluded that Mr. Sanchez's conduct constituted obstruction in violation of Okla. Stat. tit. 21, § 540, because the officers had a right to detain Mr. Sanchez during the search and, therefore, had the authority to order him to get down.[9]  Mr. Sanchez's flight, in violation of the officers' lawful order, impeded the officers who were executing the search warrant because the search was delayed while they apprehended him.  Discussing Oklahoma law interpreting § 540, the court of appeals stated:

> The Oklahoma courts have interpreted the statute in a common-sense manner.  For example, in *Trent v. State*, 777 P.2d 401 (Okla.Crim.App.1989), the court considered the conduct of a passenger after a traffic stop for driving under the influence.  The passenger refused to leave the scene and engaged in "loud and angry" verbal harassment of the officer.  *Id*. at 402-03. The court held that this conduct violated the statute because the passenger's actions prevented the officer from removing the driver's vehicle from the road and timely testing the driver's blood-alcohol level. *See id*. at 403. . . .
>
> Mr. Sanchez's flight unquestionably impeded the officers executing the search warrant.  Rather than conducting the search, they needed to chase and apprehend him.  Various courts, interpreting statutes similar to Okla. Stat. Ann. tit. 21, § 540, have held that flight can constitute obstruction of an officer.  "[F]light, or attempted flight, after a command to halt constitutes obstruction of an officer." *In re E.G.*, 286 Ga. App. 137, 648 S.E.2d 699, 701 (2007) (internal quotation marks omitted) . . . .

*Sanchez*, 555 F.3d at 919; *see also Koch*, 660 F.3d at 1240-41 (police officer assigned to investigate whereabouts of elderly woman had probable cause to believe caretaker's refusal to respond to his inquiry constituted obstruction under § 540); *United States v. Christian*, 190 F. App'x 720, 722-23 (10th Cir. 2006) (police had probable cause for arrest under § 540 where the arrestee became

_____

[9]  The statute provides:  "Every person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his office, is guilty of a misdemeanor."  Okla. Stat. tit. 21, § 540.

agitated and distracted officers during an investigation in a parking lot and refused to comply with a lawful command to step away).

In this case, Plaintiff's refusal to obey the officers' emergency signals to stop his vehicle, as well as his delay in complying with instructions to exit the vehicle and move away from it after he stopped, impeded the officers' investigation of the domestic dispute call made by Ms. Hunter. Officers Bemo and Nelson were justified in following Plaintiff from the scene of Ms. Hunter's call and attempting to stop his flight until they could investigate the circumstances of her request for assistance. By failing to comply with lawful orders of Officers Bemo and Nelson, Plaintiff prevented them from performing their duties in responding to Ms. Hunter's emergency call. Therefore, the Court finds that Plaintiff's arrest was based on probable cause to believe he had committed a criminal offense of obstruction.

For these reasons, the Court finds no unconstitutional conduct by the Officers involved in the seizure of Plaintiff.[10] Because Plaintiff cannot establish a violation of the Fourth Amendment, Defendants are entitled to summary judgment on the § 1983 claim based on an unlawful seizure.

### c. Qualified Immunity

In any event, a finding that the Officers lacked probable cause to arrest Plaintiff would not end the qualified immunity analysis. "As to whether the law was clearly established at the time of the alleged violation, we require a section 1983 plaintiff to show that 'it would have been clear to a reasonable officer that probable cause was lacking under the circumstances . . . .'" *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012) (quoting *Koch*, 660 F.3d at 1241). "[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to

_____

[10] There are no facts to suggest that Lt. Cooper and Sgt. Blumenthal played any part in Plaintiff's seizure, apart from the alleged use of excessive force in effectuating his arrest. Therefore, Lt. Cooper and Sgt. Blumenthal are clearly entitled to summary judgment on Plaintiff's unlawful seizure claim.

immunity.  Therefore, when a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff."  *Cortez*, 478 F.3d at 1120 (citation and footnote omitted).  If the Officers had "arguable probable cause" to arrest Plaintiff, then they are entitled to qualified immunity.  *Id*. at 1121; *see Kaufman*, 697 F.3d at 1300; *Koch*, 660 F. 3d at 1241;  (10th Cir. 2011).

Based on the information conveyed by the 911 dispatcher, Officers Bemo and Nelson reasonably, if mistakenly, believed that Ms. Hunter was a possible victim of domestic abuse, and reasonably believed that Plaintiff had threatened her.  Officers Bemo and Nelson were assigned to respond and investigate Ms. Hunter's call for emergency assistance.  Officer Brown arrived to assist them after Plaintiff initially failed to stop for police vehicles.  Under these facts, and based on Plaintiff's conduct in failing to obey verbal commands after he finally stopped his truck, the Officers could reasonably have believed that Plaintiff was obstructing or impeding the performance of their lawful duties.  Therefore, the Officers had arguable probable cause to arrest Plaintiff.

For these reasons, based on the undisputed facts shown by the record, the Court finds that the Officers are entitled to qualified immunity from Plaintiff's § 1983 claim of unlawful seizure.

### d.   Municipal Liability

The City also moves for summary judgment on Plaintiff's § 1983 claim due to an insufficient factual basis for municipal liability.  Plaintiff seeks to impose § 1983 liability on the City for his allegedly unlawful arrest based on purportedly deficient OCPD policies and inadequate training regarding lawful arrests.  It is well established, however, that "even if it could be said that [the City's] policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation." *Trigalet v. City of Tulsa*, 239

18

F.3d 1150, 1155-56 (10th Cir. 2001); *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986);

*Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing

"the Heller rule" as well established); *see also Ellis ex rel. Estate of Ellis v. Ogden City*, 589 F.3d

1099, 1104 (10th Cir. 2009).  Because Plaintiff has failed to establish a constitutional violation, the

City cannot be held liable under § 1983 for Plaintiff's arrest.

In addition, the factual basis for Plaintiff's claim of municipal liability consists solely of

certain parts of OCPD's written policies, and arguments of counsel regarding alleged inadequacies

in their language and any training based on them.  *See* Pl.'s Resp. City's Mot. [Doc. No. 72] at 26-

28, 36-37.  Plaintiff has not offered any expert opinion or competent evidence of a deficiency in

OCPD's policies or officer training regarding constitutional limits on seizures and arrests.  Further,

Plaintiff has failed to point to any facts that would establish a direct causal link between any

deficiency and his arrest.  Therefore, for this additional reason, the City is entitled to summary

judgment on Plaintiff's § 1983 claim regarding his arrest.

### 2. **Indifference to Medical Needs**

#### a. **Constitutional Violation**

Plaintiff concedes that the Officers promptly called for medical assistance after taking him

into custody.  He claims, however, that the arresting officers were deliberately indifferent to his

medical conditions, of which he advised them during the confrontation, because they chose to utilize

force despite knowing his delay in exiting the truck was due to an injured hand, and utilized a taser

despite knowing he had a "heart condition."  Defendants seek summary judgment on the ground that

police officers are not constitutionally required to cease efforts to take an arrestee into custody, or

exempt him from handcuffing, simply because he reports a medical condition.

The Fourteenth Amendment protects individuals in police custody from a denial of medical attention to the same extent that the Eighth Amendment protects convicted inmates.  *See* Order of Jan. 25, 2012 [Doc. No. 26] at 3-4.  To establish a claim for constitutionally inadequate medical care, a plaintiff must show "deliberate indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The Tenth Circuit has summarized the applicable standard as follows:

> The test for deliberate indifference is both objective and subjective.  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir.2006).  The objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of the Eighth Amendment.  *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir.2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).  In *Mata*, we explained that it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely "the symptoms presented at the time the prison employee has contact with the prisoner."  427 F.3d at 753.

*Martinez*, 563 F.3d at 1088.  In this case, Plaintiff has presented no facts to show that he suffered any serious harm, or had a sufficiently serious medical need at the time of his arrest, that would satisfy the objective component of his claim.

The court of appeals also explained in *Martinez* the subjective component as follows:

> "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Callahan*, 471 F.3d at 1159 (internal quotation marks omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.  Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference.  The question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"  *Mata*, 427 F.3d at 753.

*Martinez*, 563 F.3d at 1089 (footnote omitted).  Under this analysis, the question is whether the Officers knew of a substantial risk of harm to Plaintiff but chose to disregard it.

The only fact or argument on which Plaintiff relies to satisfy this element concerns the risk of injury that a taser poses to a person with a heart problem.[11]  Plaintiff cites *Howard v. Dickerson*, 34 F.3d 978 (10th Cir. 1994), and *Martin v. Board of County Commissioners*, 909 F.2d 402 (10th Cir. 1990), for the proposition that arresting officers who fail to consider an arrestee's medical condition and act in a way that may cause injury are sufficiently culpable.  The facts of these cases are distinguishable, but instructive on the degree of callousness that is necessary to satisfy the constitutional standard.

In *Howard*, police officers arrested a woman wearing a neck brace and insisted on handcuffing her with arms behind her back, despite repeated complaints of pain and requests to place her hands in front of her body to avoid injury following neck surgery; they also refused her request for a doctor during the booking procedure.  *See Howard*, 34 F.3d at 979.  In *Martin*, police officers arrested a hospital patient with a fractured neck upon release, and transported her to jail without following medical instructions regarding how to safely perform the move; they were expressly informed of the risk of injury, including paralysis, if the physician's instructions were not followed.  *See Martin*, 909 F.2d at 403-04.  In each case, the arrestee's symptoms or the medical information provided was such that the police officers knew their conduct created a substantial risk of harm, but they recklessly chose to disregard the risk.  In this case, Plaintiff has not provided any facts to show he displayed cardiac symptoms or provided medical information that alerted the

---

[11] Although Plaintiff provides no facts regarding this alleged risk, the City presents training materials that warn about possible physiologic or metabolic effects of a taser discharge and an increased risk for individuals with certain pre-existing conditions, including cardiac disease. *See* Def. City's Br. Ex. 38 [Doc. No. 60-38] at 8-9.  The cited manual does not prohibit the use of a taser on a person with cardiac disease, however, nor explain the degree of risk to such persons.

arresting officers to a substantial risk of harm from discharging the taser into his back.  Therefore, on the record presented, Plaintiff cannot satisfy the subjective component of his claim.

In short, Plaintiff has not demonstrated he was denied medical care while in police custody or that the Officers' treatment of him constituted deliberate indifference to a serious medical need. Thus, the Officers are entitled to summary judgment on Plaintiff's § 1983 claim regarding his medical needs.[12]

### b.      Municipal Liability

For the reasons previously stated with regard to Plaintiff's alleged unlawful arrest, Plaintiff cannot establish liability of the City for any deliberate indifference of the Officers to a medical need. First, because Plaintiff has failed to establish a constitutional violation, the City cannot be held liable under § 1983 for Plaintiff's medical-need claim.  Second, Plaintiff offers no facts or evidence that would establish a deficiency in OCPD written policies or officer training regarding attention to arrestees' medical needs.  Therefore, the City is entitled to summary judgment on Plaintiff's § 1983 claim regarding his medical conditions.

### 3.      Excessive Force

### a.      Liability of Officer Blumenthal

Plaintiff's only evidence of Officer Blumenthal's personal participation in any constitutional violation is a statement of Officer Bemo indicating that Officer Blumenthal used force against Plaintiff.  Defendants contend Plaintiff's testimony that such a statement was made is inadmissible hearsay, and thus Plaintiff cannot establish a § 1983 claim against Officer Blumenthal.  In response,

---

[12]  Because the Officers do not argue qualified immunity regarding Plaintiff's medical-need claim, the Court does not consider whether Plaintiff can demonstrate that established law in 2010 provided fair notice to the Officers that a taser could not constitutionally be used on persons with pre-existing medical conditions.

Plaintiff concedes that his case against Officer Blumenthal hinges on a statement allegedly made by Officer Bemo to Plaintiff on the night of his arrest to the effect of "Officer Blumenthal kicked you." *See* Pl.'s Resp. Officers' Mot. [Doc. No. 71] at 14-15. Plaintiff argues that his testimony regarding this comment "creates a question of fact and jury question on this issue." *Id*. at 15. Defendants object, as authorized by Rule 56(c)(2), on the ground that Officer Bemo's alleged statement cannot be presented in a form that would be admissible in evidence.

Defendants' argument is well taken. Officer Bemo's alleged statement would constitute hearsay under Rule 801, Fed. R. Evid., and Plaintiff's testimony concerning it would be inadmissible against Officer Blumenthal at trial under Rule 802. Plaintiff offers in his summary judgment brief no theory of admissibility, even though Officer Blumenthal expressly sought summary judgment on this basis. *See* Officers' Mot. Summ. J. [Doc. No. 65] at 18 (citing *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303 (10th Cir. 2005)). The court of appeals held in *Jaramillo* that "[h]earsay testimony that would not be admissible at trial is not sufficient to defeat a motion for summary judgment." *Id*. at 1314. Here, Plaintiff has failed to come forward with any properly supported fact to establish Officer Blumenthal's personal participation in any unconstitutional use of force against Plaintiff in effecting his arrest. Therefore, Plaintiff cannot establish a § 1983 claim against Officer Blumenthal, and Officer Blumenthal is entitled to summary judgment on this claim.

### b.     Municipal Liability

The City challenges Plaintiff's § 1983 claim of municipal liability for any unconstitutional use of force that occurred. In his response, Plaintiff points to alleged deficiencies in OCPD's written policies on the date of his arrest regarding the use of force generally and the use of tasers. Plaintiff's challenge to these policies is based, in part, on counsel's argument regarding language of the policies that he believes is unsatisfactory or provides inadequate guidance to officers in the field.

As stated *supra* regarding Plaintiff's challenge to other written policies, argument that is unsupported by any fact or evidence to establish a deficiency in OCPD's use-of-force policy is ineffectual.  The policy expressly incorporates the applicable constitutional standards.  *See* Def. City's Br., Ex. 51 [Doc. No. 60-51]; Pl.'s Resp. City's Mot., Ex. 35 [Doc. No. 72-35].

Regarding the taser policy, however, Plaintiff relies on the fact that, according to Chief William Citty, Officer Bemo's use of a taser against Plaintiff would not be permitted under OCPD's current policy.  Plaintiff argues that the change of policy was required to comply with the court of appeals' decisions in *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007), and *Cavanaugh v. Woods Cross City*, 625 F.3d 661 (10th Cir. 2010).  Plaintiff asserts that, prior to the change, OCPD's policy regarding the use of tasers was constitutionally inadequate under these decisions and, further, the training OCPD officers received under the policy did not sufficiently limit the situations in which a taser could be used to effectuate an arrest.

### (1)     Unconstitutional Policy

The constitutional standard governing excessive force claims under the Fourth Amendment was established in *Graham v. Connor*, 490 U.S. 386, 399 (1989), to be "objective reasonableness under the circumstances."  This standard "is not capable of precise definition" but, instead, its "application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*. at 396 (internal quotation omitted).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene," but the inquiry "is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in

light of the facts and circumstances confronting them, without regard to their underlying intent and motivation." *Id*. at 396-97.

Applying this standard in *Casey*, 509 F.3d at 1286, the court of appeals held that "the use of a Taser immediately and without warning against a misdemeanant" who was nonviolent and not actively resisting arrest or attempting to flee, was objectively unreasonable under *Graham*.   In *Casey*, an officer carrying a taser fired as soon as she arrived on the scene of a struggle between a citizen and another officer, without obtaining sufficient information to determine the reasonableness of her actions.   The court found "especially troubling" the "absence of any warning – or of facts making clear that no warning was necessary."   *Id*. at 1285.   The officer gave the subject "no opportunity to comply with her wishes before firing her Taser."   *Id*.   After surveying cases from other circuits, the court of appeals concluded that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force – or a verbal command – could not exact compliance."   *Id*. at 1286.

Under similar circumstances in *Cavanaugh*, 625 F.3d at 667, the court of appeals followed the holding of *Casey* and concluded it was clearly established that a police officer "could not use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning."   The court also found in *Cavanaugh* a sufficient basis for municipal liability based on evidence that the city's "unwritten taser policy was the moving force behind [the officer's] actions."   *Id*.   Although the constitutionality of the written policy was conceded, the police chief's testimony suggested the existence of "a constitutionally deficient unwritten Taser policy."   *Id*. at 663-64.

Under the holdings of these cases, Plaintiff has failed to identify a constitutionally deficient taser policy.   He relies on OCPD's written policy at the relevant time, but it provided that a taser

"may be used to control a dangerous or violent subject where other tactics have been, or will likely be, ineffective in the situation."  *See* Def. City's Br., Ex. 35 [Doc. No. 60-35] at 1, § 152.0.[13]  The policy also permitted the use of a taser "when other less lethal force options have been ineffective or when it reasonably appears that such options will be ineffective in subduing the subject."  *Id*. § 152.0(A).  It also stated general usage criteria as follows:  "The ERD [or electronic restraint device] is considered a use of force and shall be deployed in a manner consistent with the Department's use of force policy and training guidelines."  *Id*. § 152.0(A)(1).  In addition to stating methods of use (such as discharging the taser at "center mass"), the usage criteria included a statement that a taser could "be deployed where subject(s) actively resist(s) in a defensive manner." *Id*. § 152.0(A)(1)(c).  Finally, it listed situations where a taser may properly be used as follows:

> The ERD <u>may be</u> used when:
>
>     a.    Lesser force options are/or likely to be ineffective.
>
>     b.    The officer reasonably believes the suspect poses a credible threat.
>
>     c.    The subject poses a threat from a distance and the officer is at risk of injury if he/she attempts to close the gap.

*Id*. § 152.0(A)(1) (emphasis in original).

On its face, the written policy is fully consistent with *Casey* and *Cavanaugh*.  The use of a taser was permitted only for violent or dangerous persons in situations where it was necessary to subdue the person, the person was actively resisting the officer, or the officer perceived a credible threat.  Plaintiff's reliance on Chief Citty's deposition testimony is similarly unavailing.  Chief Citty testified that the use of a taser on Plaintiff under the circumstances stated in the officer's reports was justified.  Unlike Plaintiff's version of events, the arresting officers stated that Plaintiff was actively

_____

[13] Plaintiff submits the same document in support of his response. *See* Pl.'s Resp. City's Mot., Ex. 12 [Doc. No. 72-12].  For convenience, only the City's exhibit is cited in the discussion.

resisting efforts to handcuff him, that three officers used other control techniques first without success, and that Officer Bemo did a warning arc-display before employing his taser on Plaintiff. While these facts are disputed in this case, Chief Citty's testimony assumed them to be true.

Further, the change of policy to which Chief Citty testified was that the current OCPD policy prohibits the use of a taser "unless a person is actively aggressive towards the officer" rather than simply resisting arrest and failing to comply.  *See* Citty Dep. 72:20-73:5.  This change, and other modifications of the policy, were based on company recommendations, nationwide studies, court rulings,  and developments in best practices indicating that a taser should not be used solely for compliance.  *Id*. 72:14-19; 73:21-76:1.  The changes were not based on a particular court ruling or case.  *Id*. 76:8-22.  They were not compelled by *Casey* or *Cavanaugh*, in which a taser was used under circumstances that did not involve an effort to control a noncompliant subject.

Regarding OCPD's allegedly unconstitutional taser policy, Plaintiff's argument is not that the policy in effect in 2010 directed officers to use tasers under circumstances where doing so would be unconstitutional but, instead, that the policy failed to limit officers' discretion in determining when to use a taser.  However, the fact that OCPD gave its officers discretion to determine if they could lawfully use a taser on a person who was resisting efforts to handcuff him does not suggest that its policy was unconstitutional.  Under binding case law, "'discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1260 (10th Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986)).  In *Novitsky*, the court of appeals found no proof of an unconstitutional policy regarding police officers' use of a "twist lock" procedure to remove a person from a vehicle based solely on the fact that the police department's policy allowed officers to determine when circumstances justified the use of the procedure.  Here, as in *Novitsky*,

Plaintiff has not presented any more than a policy of discretion in the exercise of particular functions.  Accordingly, like the court of appeals in *Novitsky* the Court finds that "[n]o reasonable jury could infer the existence of an unconstitutional policy" based on the facts and evidence presented by Plaintiff.  *See id.*

### (2)    Inadequate Training

"[Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Because "deliberate indifference" is a stringent standard, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) (internal quotation omitted).  This is so because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*  In this case, Plaintiff presents no fact or evidence that would establish a pattern of similar violations by OCPD officers.

The Supreme Court left open the possibility in *Canton* that municipal liability for failure to train police officers might arise from a single incident if "in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390.  Under Tenth Circuit case law, "a single incident of excessive force can establish the existence of an inadequate training program if there is some other evidence of the program's inadequacy." *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000); *accord Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).  In

this case, Plaintiff presents no evidence of a deficiency in OCPD's training program regarding

tasers, other than Officer Bemo's use of his taser against Plaintiff under allegedly inappropriate

circumstances.[14]   Therefore, the Court finds that Plaintiff has failed to provide factual support for

§ 1983 liability of the City based on a failure to adequately train its police officers.

(3)      **Inadequate Supervision**

In a separate section of Plaintiff's response to the City's Motion, Plaintiff also asserts there

is a sufficient factual basis for holding the City liable for failing to adequately supervise OCPD

officers, citing *Bryson v. City of Oklahoma City*, 627 F.3d 784 (10th Cir. 2010).  In *Bryson*, the court

of appeals considered municipal liability for unconstitutional conduct by a forensic chemist based

on the City's failure to provide adequate training or meaningful supervision.  Under either theory,

the plaintiff was required to show that "the City's policymakers 'can reasonably be said to have been

deliberately indifferent to the need' for further training or supervision." *Id*. at 789 (quoting *Canton*,

489 U.S. at 390).  Both theories require "actual or constructive notice that the municipality's action

or failure to act is substantially certain to result in a constitutional violation," and notice can arise

from either "a pattern of unconstitutional behavior" or narrow circumstances in which "a violation

of federal rights is a highly predictable or plainly obvious consequence of a municipality's action

or inaction." *Id*. (internal quotation omitted).  In addition, the plaintiff must show a causal link

between the failure to supervise and the constitutional injury suffered.  *Id*. at 790.

To support his inadequate supervision theory, Plaintiff relies on facts regarding:  1) OCPD's

handling of his citizen's complaint regarding the officers' conduct as evidence of indifference to

---

[14]  Plaintiff attempts to provide additional evidence based on a stated fact that, prior to his arrest, OCPD did not provide computerized "Shoot, Don't Shoot" training to officers who carry tasers, similar to training given for the use of firearms.  *See* Pl.'s Resp. City's Mot. [Doc. No. 72] at 12, ¶ 9.  This statement of fact is unsupported by the cited deposition of Chief Citty, who was asked whether the computer module was available in 2010; he answered that he did not know.  *See* Citty Dep. 87:21-88:2.

29

unconstitutional behavior; 2) OCPD's handling of a disciplinary matter involving Sgt. Blumenthal as evidence of over-reliance on a collective bargaining agreement; and 3) Lt. Cooper's failure to intervene on the night of Plaintiff's arrest.  First, Plaintiff does not explain any causal link between the handling of his complaint (or any other citizen's complaint) and the Officers' alleged use of excessive force.  Second, the City's reinstatement of Sgt. Blumenthal after an adverse arbitration decision is immaterial because Plaintiff cannot establish that Sgt. Blumenthal played any role in any unconstitutional conduct.  Third, Lt. Cooper's alleged inadequate supervision of the arresting officers may create personal liability for him.  *See Casey*, 509 F.3d at 1283.  But there is no allegation or evidence that Lt. Cooper was a policymaker for the City.  Absent some other basis for municipal liability, the City cannot be held liable for Lt. Cooper's failure to intervene on the night of Plaintiff's arrest.

### (4)     Conclusion

Therefore, on the record presented, the Court finds that the City is entitled to summary judgment on Plaintiff's § 1983 claim of excessive force.

### B.     Intentional Infliction of Emotional Distress

The Officers contend Plaintiff is pursuing an inappropriate tort theory in order to avoid a statute of limitations that would bar the type of tort claims supported by his factual allegations, namely, false arrest and assault and battery.  They argue that Oklahoma law does not permit this tactic, relying primarily on *Thomas v. Casford*, 363 P.2d 856, 858 (Okla. 1961), and *Kimberly v. DeWitt*, 606 P.2d 612, 614 (Okla. Civ. App. 1980).  The Officers also contend Plaintiff has not presented sufficient facts to establish the sort of extreme and outrageous conduct that would satisfy the applicable legal standard.

The Court is not convinced that *Thomas* stands for the proposition that a plaintiff may be limited to a particular legal theory if the factual allegations of his pleading would also support another theory of recovery. *Thomas* predated the Oklahoma Supreme Court's decision in *Breeden v. League Services Corp.*, 575 P.2d 1374 (Okla. 1978), recognizing the tort of outrage or intentional infliction of emotional distress. The question presented in *Thomas* was not whether the plaintiff was limited to a particular theory of recovery, but what statute of limitations was applicable to the claim asserted in the petition, which alleged simply that the defendant's conduct was a "malicious and intentional act." *See Thomas*, 363 P.2d at 857. The supreme court held that the petition stated a cause of action for assault and battery, and was time barred. *Id*. at 859.

Similarly, the Oklahoma Court of Civil Appeals did not hold in *Kimberly* that a plaintiff must pursue an assault and battery claim exclusively, even where an alternative legal theory is available. The plaintiff's pleading alleged "gross negligence and violence" by certain defendants but the factual allegations stated only a claim of assault and battery as to these defendants. *See Kimberly*, 606 P.2d at 614. Like *Thomas*, the question was not whether the plaintiff could be required to pursue a particular theory, but what claim was asserted and which statute of limitations to apply.

More recent decisions of the Oklahoma Supreme Court have permitted the pursuit of multiple theories of recovery based on the same operative facts. For example, in *Chandler v. Denton*, 741 P.2d 855, 863-64 (1987), the plaintiff was permitted to press tort theories of liability governed by the two-year statute of limitations – including trespass, extortion, and intentional infliction of emotional distress – even though an assault and battery claim based on the same operative event was time-barred. The Court's research reveals that courts in other jurisdictions have permitted persons involved in altercations with police officers to proceed under multiple tort theories, including intentional infliction of emotional distress, and to address the issue as one of

overlapping theories and duplicative damages.  *See*, *e.g.*, *Bender v. City of New York*, 78 F.3d 787, 791-92 (2d Cir. 1996); *see also* Carol Schultz Vento, Annotation, *Recovery of Emotional Distress Resulting From Actions of Law Enforcement Officers*, 101 A.L.R.5th 515, § 4 (2002).  Accordingly, the Court finds that if Plaintiff can establish a viable tort claim, he should not be precluded from pursuing it simply because another claim is time-barred.

To prevail on a claim of intentional infliction of emotional distress under Oklahoma law, a plaintiff must show:  "(1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe."  *See Computer Publications, Inc. v. Welton*, 49 P.3d 732, 735 (Okla. 2002).  To satisfy the second element, the defendant's conduct must be so extreme and outrageous as to be "beyond all possible bounds of decency" in the setting in which it occurred, or "utterly intolerable in a civilized community."  *See Eddy v. Brown*, 715 P.2d 74, 77 (Okla. 1986); *see also Welton*, 49 P.3d at 735; *Kraszewski v. Baptist Medical Center of Okla., Inc.*, 916 P.2d 241, 248 (Okla. 1996).  "In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'"  *Welton*, 49 P.3d at 735.

Upon careful consideration of the summary judgment record, the Court finds insufficient facts to support a finding of outrageous conduct by two officers.  As to Sgt. Blumenthal, Plaintiff has no admissible evidence that he had any involvement in the incident, as explained *supra* with regard to Plaintiff's § 1983 excessive force claim.  Similarly, as to Lt. Cooper, his only alleged wrong was failing to intervene at some point, assuming he could have, to prevent the injuries allegedly inflicted by the arresting officers.  If proved, Lt. Cooper failed to perform his supervisory

duties and may be liable under § 1983 for Plaintiff's injuries, but his failure would not constitute the sort of extreme and outrageous behavior that could create tort liability.

As to Officers Bemo, Nelson and Brown, the alleged facts presented by Plaintiff, if accepted as true and viewed in the light most favorable to him, could support a finding that they participated in an unprovoked, brutal attack on Plaintiff under the guise of taking him into custody. Plaintiff and Ms. Hunter have testified that the arresting officers engaged in a physical and verbal attack on Plaintiff – utilizing blows to his head, kicks, and a taser, together with profane and threatening language –  which was designed to punish Plaintiff for a perceived defiance of their orders and instructions. Accepting this description of the event, it could lead reasonable jurors to find extreme conduct by police officers engaged in responding to a routine emergency call, which, under the circumstances, could lead an average member of the community to exclaim, "Outrageous!" Therefore, the Court finds that Officers Bemo, Nelson and Brown are not entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.[15]

For these reasons, the Court finds that Lt. Cooper and Sgt. Blumenthal are entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress, but a genuine dispute of material fact precludes summary judgment to Officers Bemo, Nelson and Brown.

## C.    Tortious Interference with Employment

Plaintiff 's claim against Officer Bemo for tortious interference with employment is based on Officer Bemo's telephone call to CLEET regarding the July 3, 2010 incident and an alleged contact with Plaintiff's employer, Norman Regional Hospital. To prove this claim, Plaintiff must establish the following elements: "1) interference with a business or contractual right; 2) malicious

---

[15] Of course, Plaintiff would also need to establish other elements of his tort claim, including the officers' conduct caused him emotional distress that was severe.  However, the Officers' Motion does not challenge Plaintiff's ability to prove these elements.

and wrongful interference that is neither justified, privileged, nor excusable; and 3) damage proximately sustained as a result of the interference." *Tuffy's, Inc. v. City of Oklahoma City*, 212 P.3d 1158, 1165 (Okla. 2009) (footnotes omitted). Officer Bemo contends Plaintiff cannot establish that the contact with CLEET caused any damage because no action was taken against Plaintiff as a result of the call. Officer Bemo also contends Plaintiff lacks admissible evidence to show that he contacted Plaintiff's employer or that any contact resulted in Plaintiff's termination of employment.

Plaintiff concedes he did not lose CLEET certification or suffer any adverse action from CLEET after Officer Bemo's telephone call; he argues simply that "he did later lose his job at Norman Regional Hospital." *See* Pl.'s Resp. Officers' Mot. [Doc. No. 71] at 13. Plaintiff points to no fact or evidence, however, that would connect Officer Bemo's CLEET contact in July, 2010, and an adverse action by Plaintiff's employer more than two years later in October, 2012. In fact, the argument presented in Plaintiff's brief is not that a reasonable fact-finder could infer any connection between the CLEET contact and his termination, but that Officer Bemo's "blatant actions with respect to CLEET . . . [raise] an inference that Defendant Bemo may be lying about whether he contacted Plaintiff's employer." *See id.* Because Plaintiff makes no showing of damage resulting from Officer Bemo's call to CLEET, the Court finds that Plaintiff cannot establish an interference claim against Officer Bemo based on this conduct.

As to Officer Bemo's alleged contact with Plaintiff's employer, the Court finds that Plaintiff lacks any evidence to establish a contact occurred. The sole basis of Plaintiff's opposition to summary judgment on this ground is his own testimony regarding a conversation with his supervisor, Mr. Thompson. Plaintiff articulates no theory of admissibility of this hearsay statement. In any event, according to Plaintiff's testimony, the conversation with Mr. Thompson occurred in December, 2010, and the only information Mr. Thompson would disclose was that someone from

the Oklahoma City Police Department had contacted Norman Regional Hospital about the incident; Officer Bemo was never identified as the caller. *See* Tucker Dep. 50:15-23, 52:8-53:2, 54:1-10, 57:20-23. Further, no reasonable inference can be made of a causal connection between any contact in 2010 and Plaintiff's termination two years later. *See O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (only a "very close temporal proximity" between events might support an inference of causation).

Therefore, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of material facts regarding his tortious interference claim, and that Officer Bemo is entitled to summary judgment on this claim.

## Conclusion

For these reasons, the Court finds that the City is entitled to summary judgment on Plaintiff's § 1983 claim against it and that the Officers are entitled to summary judgment on Plaintiff's § 1983 claim alleging an unconstitutional seizure and indifference to medical needs. Sgt. Blumenthal is also entitled to summary judgment on Plaintiff's § 1983 claim alleging excessive force, but Officers Bemo, Nelson, and Brown, and Lt. Cooper concede that Plaintiff's § 1983 claim of excessive force against them involves disputed issues of material facts. Further, the Officers are entitled to summary judgment on all Plaintiff's state law tort claims except his claim of intentional infliction of emotional distress asserted against Officers Bemo, Nelson and Brown.

IT IS THEREFORE ORDERED that Defendant City of Oklahoma City's Motion for Summary Judgment [Doc. No. 57] is GRANTED, and the Partial Motion for Summary Judgment of the Defendant Officers [Doc. No. 65] is GRANTED in part and DENIED in part, as set forth herein. The claims remaining for trial are Plaintiff's § 1983 claim of excessive force against

Officers Bemo, Nelson, and Brown, and Lt. Cooper, and Plaintiff's tort claim of intentional infliction of emotional distress against Officers Bemo, Nelson, and Brown.

IT IS SO ORDERED this 20th day of September, 2013.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE